
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| **LOREN KEITH FARNSWORTH** § | | |
| xxx-xx-5830 § | Case No. 11-43703 | |
| **and AMY CAROL FARNSWORTH** § | | |
| xxx-xx-2213 § | | |
| § | | |
| § | | |
| Debtors § | Chapter 7 | |
| RJR INSURANCE SERVICES, INC. § | | |
| § | | |
| Plaintiff § | | |
| § | | |
| v. § | Adversary No. 12-4039 | |
| § | | |
| LOREN KEITH FARNSWORTH § | | |
| § | | |
| § | | |
| Defendant § | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint in the above-referenced adversary proceeding filed by the Plaintiff, RJR Insurance Services, Inc., seeking a determination of whether an alleged debt owed to it by the Defendant, Loren Keith Farnsworth, is dischargeable, the Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052. This decision disposes of all issues pending before the Court.

# FINDINGS OF FACT[1]

1. Plaintiff, RJR Insurance Services, Inc. ("RJR"), is solely owned by Richard P. Dale, Jr.[2]

2. RJR is a Texas-based company operating throughout the United States.[3]

3. RJR is primarily a marketing company, marketing life and health insurance products from other companies to seniors.[4]

4. Defendant, L. Keith Farnsworth ("Defendant"), started employment with RJR in February 2007.[5]

5. The Defendant began at RJR as a Chief Marketing Officer but soon changed to the role of Chief Operating Officer.[6] He reported directly to the owner, Richard Dale, Jr.

6. As Chief Operating Officer, the Defendant oversaw many of the internal operations of RJR, including IT operations, Call Center operations, and Recruiting Department operations.[7]

7. RJR utilized telemarketers in its Call Center to make preset appointments for its independent sales agents, with the intent to sell its Medicare supplement, life insurance, and discount plans to seniors.[8]

---

[1] The Court notes for the record that the Defendant offered no testimony in support of his contentions and presented limited documentation which was admitted only to illustrate the nature of the internal reports involved and the methodology by which internal accounting occurred and not for the accuracy of the information contained therein.

[2] ¶ 5(a) of the Agreed Issues of Fact. The agreed issues of fact were set forth as paragraph (5) in the approved Joint Pre-Trial Order entered in this adversary proceeding on April 15, 2013.

[3] ¶ 5(c) of the Agreed Issues of Fact.

[4] ¶ 5(b) of the Agreed Issues of Fact.

[5] ¶ 5(d) of the Agreed Issues of Fact.

[6] ¶ 5(f) of the Agreed Issues of Fact.

[7] ¶ 5(g) of the Agreed Issues of Fact.

[8] ¶ 5(h) of the Agreed Issues of Fact.

8. To increase the productivity of the Call Center employees, RJR established a Call Center bonus program whereby additional compensation would be paid to Call Center employees based upon comparative performance.

9. All such bonuses were paid in cash and were reported as earned income of the bonus recipient.

10. On a periodic basis [usually on Monday of each week], RJR, through its vice-president for accounting, Jerry W. McCreight, delivered to the Call Center management staff varying amounts of cash for the purpose of paying performance bonuses to [i.e., "incentivizing"] high performing employees in the Call Center.[9]

11. The cash bonuses were distributed to Call Center employees by the Defendant or at Defendant's direction on a daily basis.

12. The Defendant accounted for the amount of cash bonuses paid to each Call Center employee by tendering a written report to the RJR accounting office at the end of each week.[10]  However, that report did not account for undistributed cash retained under the Defendant's control.

13. RJR relied upon the Defendant to report in an accurate manner the amount of bonuses paid to Call Center employees on a weekly basis.

14. Based upon the Defendant's report, RJR accordingly made appropriate entries in the employees' records to show the taxable income of each of the Call Center employees, including the bonuses paid for that particular week.[11]

15. During the pendency of his employment, the Defendant never returned to RJR any of the cash tendered to him for use in the Call Center bonus program.[12]

---

[9]  ¶ 5(i) of the Agreed Issues of Fact.

[10] See Defendant's Ex 4.

[11] ¶ 5(j) of the Agreed Issues of Fact.

[12] RJR's accountant acknowledged that there were three occasions during Defendant's supervision of the Call Center in which cash "holdbacks" of less than $500 for employee events were authorized.  Those amounts are not included as components of the missing cash in this case.

16. Thus, the Defendant was advanced cash amounts every week under the Call Center bonus program with no specified amount designated in advance to be paid to any particular employee in any particular week.

17. This differentiated the RJR Call Center bonus program from the RJR Internal Recruiter bonus program which was also under the Defendant's supervision, but under which the Defendant initially tendered a report to RJR accounting that justified the payment of particular bonuses that had been earned by particular recruiters and under which a specified amount of cash would be tendered to the Defendant for distribution of specific amounts to specific recruiters.

18. The Defendant held much greater discretion with regard to the protection and distribution of cash tendered to him under the Call Center bonus program, and the accounting for same, than under the recruiter bonus program.

19. Notwithstanding such differences and the greater discretion exercised by the Defendant with regard to the corporate assets tendered to his care under the Care Center bonus program, no audit was conducted with regard to the Defendant's stewardship of the corporate cash placed in his trust under the RJR Call Center bonus program until November 2010.

20. Upon discovering that the Defendant had misused corporate assets [an AT&T upgrade card] to make an unauthorized purchase of an iPhone for his wife in November 2010, RJR conducted an audit of all bonus programs and other activities under which the Defendant had access to, or control of, company cash.

21. In 2008, RJR advanced to the Defendant the sum of $45,385.00 in cash and cash equivalents to be used for the RJR Call Center bonus plan, yet the Defendant reported disbursements to employees under that plan in 2008 only in the amount of $31,221.00, for an unexplained deficiency of $14,164.00.[13]

22. In 2009, RJR advanced to the Defendant the sum of $55,370.00 in cash or cash equivalents to be used for the RJR Call Center bonus plan, yet the Defendant reported disbursements to employees under that plan in 2009 only in the amount of $41,296.00, for an unexplained deficiency of $14,074.00.[14]

---

[13] Ex. 4 and 6. These 2008 disbursements literally occurred between December 28, 2007 and December 30, 2008.

[14] Ex. 3 and 6. These disbursements occurred between January 2, 2009 and December 18, 2009.

23. In 2010, RJR advanced to the Defendant the sum of $40,350.00 in cash or cash equivalents to be used for the RJR Call Center bonus plan, yet the Defendant reported disbursements to employees under that plan in 2010 only in the amount of $28,946.50 which, after a small credit granted to the Defendant, left an unexplained deficiency of $10,713.50.[15]

24. The uncontested evidence establishes that the Defendant actually received cash or cash equivalents for use in the RJR Call Center bonus plan in the aggregate amount of $141,105.00 during the relevant three-year period.

25. The uncontested evidence establishes that the Defendant reported disbursements of cash or cash equivalents under his control pursuant to RJR Call Center bonus plan in the aggregate amount of $101,463.50 during the relevant three-year period.[16]

26. Crediting the Defendant with the $690 located in the Call Center safe following the Defendant's termination, the Defendant, in his role as chief operating officer, failed to protect the funds entrusted to him and to account to RJR for the aggregate sum of $38,951.50 for the relevant three-year period.

27. There is no evidence that any portion of the missing cash directly under the Defendant's control was actually distributed pursuant to the RJR Call Center bonus plan.[17]

28. There is no evidence that any portion of the missing cash directly under the Defendant's control was actually utilized for any other legitimate, though perhaps technically unauthorized, purpose pertaining to the RJR Call Center.

29. As a corporate officer, the Defendant had a formal fiduciary relationship with RJR during the relevant time periods.

30. The Defendant's failure to protect and to account for the cash placed under his control for use in the RJR Call Center bonus program was not in the best interests of RJR.

---

[15] Ex. 2 and 6. These disbursements occurred between January 2, 2010 and November 24, 2010, which was the date of the Defendant's termination. The small amount of cash ($690) found in the Call Center's safe was credited to the Defendant by RJR.

[16] Ex. 5.

[17] *See supra* note 1. The Call Center safe did reveal written evidence of an unauthorized loan by the Defendant to a former employee of the Call Center in the amount of $250.

31. The Defendant in this case acted in a fiduciary capacity as to RJR with regard to the corporate assets placed under his control for use in the RJR Call Center bonus program.

32. The Defendant breached his fiduciary duty to RJR by failing to protect and to account for the funds placed under his control as a corporate officer controlling the RJR Call Center bonus program.[18]

33. As a result of the Defendant's failure to protect and to account for the funds placed under his control as a corporate officer controlling the RJR Call Center bonus program, RJR sustained actual damages of $38,951.50.

34. Therefore, the Defendant owes a debt to the Plaintiff, RJR Insurance Services, Inc., in the amount of $38,951.50.

35. As acknowledged in the factual stipulations, the Defendant was placed in a position of trust by RJR to control the disbursement of bonus funds to the Call Center employees.[19]

36. As Chief Operating Officer, the Defendant knew that the cash or cash equivalents were placed under his control by the corporation for use in the RJR Call Center bonus plan.

37. As Chief Operating Officer, the Defendant knew that he was entrusted with the cash or cash equivalents that were placed under his control for use in the RJR Call Center bonus plan and that he was required to protect such corporate assets and to account to the corporation for them.

38. As Chief Operating Officer, the Defendant knew that the cash or cash equivalents placed under his control constituted highly volatile and fungible corporate assets that are subject to rapid dissipation by unauthorized persons and which therefore require greater protective safeguards in order to protect it for legitimate corporate uses.

---

[18] "Inherent in defalcation is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation." *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 (1st Cir. 2002).

[19] ¶ 5(i) of the Agreed Issues of Fact.

39. The risks associated with cash usage due to its fungible nature and the fact that its "bearer paper" status renders it highly susceptible to rapid dissipation by its holder, whether authorized or not, creates a danger that is obvious to the general public.

40. The Defendant's failure to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program was highly unreasonable and constituted an extreme departure from the standard of ordinary care expected of such corporate officers.

41. The Defendant's failure to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program created an unreasonable danger of loss of such fungible corporate assets that was so obvious that the Defendant must have been aware of it.

42. The Defendant's failure to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program constituted a conscious disregard of a substantial and unjustifiable risk that his failure would violate a fiduciary duty that he owed to RJR.

43. The Defendant's failure to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program constituted a gross deviation from the standard of conduct that a law-abiding person would observe in that circumstance.

44. The Defendant's failure to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program constituted an act of extreme recklessness.

45. The Defendant and his spouse filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code on December 8, 2011.

46. RJR timely filed its Complaint to Determine Dischargeability of Debt on March 19, 2012, seeking to except its claim from the scope of any discharge granted to the Defendant pursuant to 11 U.S.C. §523(a)(4) and §523(a)(6).

47. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

# CONCLUSIONS OF LAW

1. The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§1334 and §157.

2. This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3. This Court has the authority to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case. *Morrison v. Western Builders (In re Morrison)*, 555 F.3d 473, 478–79 (5th Cir. 2009).

4. Such authority recognized in the Fifth Circuit is consistent with decisions of sister courts of appeal. *See, e.g., Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir.1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991).

5. The recognized authority of a bankruptcy court to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case was not impaired by the decision in *Stern v. Marshall*, ––– U.S. –––, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 -313 (Bankr. N.D. Tex. 2011); *Dragisic v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011).

6. Even if *Stern* had arguably impacted that authority [which it did not]:,

    > the court would be compelled to follow existing Fifth Circuit precedent as set out in *Morrison* ... as this court cannot ignore (much less 'overrule') existing binding circuit precedent, even if that precedent is thought to be inconsistent with a later decision by the Supreme Court. Only the circuit itself can overrule its own precedents.

    *Christian v. Kim (In re Soo Bin Kim)*, 2011 WL 2708985, at *2 n. 2 (Bankr. W.D. Tex., July 11, 2011), as cited in *Carroll*, 464 B.R. at 313 and *Dietz v. Ford (In re Deitz)*, 469 B.R. 11, 21 (B.A.P. 9th Cir. 2012).

7. The complaint filed by RJR seeks a determination that the debt which it alleges is owed to it by the Defendant should be excepted from discharge under 11 U.S.C. §523(a)(4) and §523(a)(6).

8. In seeking such an exception to the Debtor's discharge, the Plaintiff assumes the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

9. "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997).

*Non-dischargeability under § 523(a)(4)*: *Debt Arising From Fraud or Defalcation in a Fiduciary Capacity.*

10. 11 U.S.C. §523(a)(4) provides that "A discharge under 11 U.S.C.§ 727 does not discharge an individual from a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

11. The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

12. Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

13. However, "state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

14. The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law. Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).
>
> . . . Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

15. However, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question. *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

16. The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993)).

17. Federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable." *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012)

(citing *Gupta*, 394 F.3d at 350).

18. Under Texas law, a fiduciary relationship exists between corporate officers or directors to the corporations they serve. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *see also Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18–19 (Tex. App.– San Antonio 2006, pet. denied) ["Corporate officers owe fiduciary duties to the corporations they serve."].

19. This duty requires that corporate officers and directors act in the corporation's and shareholders' best interests. *Loy v. Harter,* 128 S.W.3d 397, 407 (Tex. App.– Texarkana 2004, pet. denied).

20. As is widely recognized in the corporate context, one of these fiduciary duties is a duty of care which is imposed upon management personnel and requires diligence and prudence in the management of a corporation's affairs. *Floyd v. Hefner,* 556 F.Supp.2d 617, 633 (S.D. Tex. 2008) (*citing Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)).

21. Case law has determined that the fiduciary duties owed by corporate officers and directors to the corporation meet the standard for a technical trust and therefore satisfy the existence of a fiduciary capacity for the purposes of §523(a)(4). *Macris v. Saxton (In re Saxton),* 2011 WL 2293320, at *7 (Bankr. N.D. Tex., June 8, 2011) (*citing Assurance Systems Corp. v. Jackson (In re Jackson*), 141 B R. 909, 915–16 (Bankr. N.D. Tex.1992)); *see also Harwood*, 404 B.R. at 393.

22. The Defendant in this case acted in a fiduciary capacity as to RJR with regard to the corporate assets placed under his control for use in the RJR Call Center bonus program.

23. Until recently, a defalcation under §523(a)(4) in this circuit required the establishment of a "willful neglect of duty" that was "essentially a recklessness standard." *Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 185 (5th Cir. 1997).

24. Willfulness in that context had been "measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." *Harwood*, 637 F.3d at 624 (citing *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001).

25. However, the United States Supreme Court has recently rejected an objective recklessness standard in favor of a heightened culpability standard for defalcation in this context.

26. In a unanimous decision in *Bullock v. BankChampaign, N.A.*, ___U.S.___, 133 S.Ct. 1754 (2013), issued on May 13, 2013, the Supreme Court declared that "defalcation" for the purposes of §523(a)(4) "includes a culpable state of mind requirement" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id*. at 1757.

27. According to *Bullock*, "where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong." *Id*. at 1759. Such an intentional wrong encompasses not only conduct which the fiduciary knows is improper, but it also encompasses reckless conduct, such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty. *Id*.

28. In seeking to require a higher degree of fault for a finding of a defalcation, similar to its "statutory neighbors" of fraud, embezzlement and larceny listed in §523(a)(4), without imposing an actual requirement of specific intent to establish a defalcation, the Supreme Court adopted a standard of recklessness "of the kind set forth in the Model Penal Code §2.02(2)(c)."[20]

29. Acknowledging that its adoption of this heightened level of culpability for defalcation cases under §523(a)(4) had been recognized earlier in bankruptcy jurisprudence from the First and Second Circuit,[21] the Court further noted with

---

[20] Model Penal Code §2.02(2)(c) states that:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(2)(c) (Thomson Reuters, Westlaw through 2012).

[21] *See, e.g.*, *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2nd Cir. 2007).

approval that this "severe recklessness" standard tracks the showing required to demonstrate scienter in federal securities cases.[22]

30. Utilizing the MPC definition of recklessness and analyzing the defalcation standard to scienter determinations in federal securities cases is an effort to exclude that type of recklessness arising as a consequence of mere negligence or inadvertence.

31. As recognized in securities law cases in the Fifth Circuit, this type of "severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers [of securities] which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams v. Baker Hughes, Inc*., 292 F.3d 424, 430 (5th Cir. 2002)

32. Thus, such a heightened culpability requirement will ensure that the "harsh sanction of non-dischargeability is reserved for those who exhibits some portion of misconduct." *Hyman*, 502 F.3d at 68-69.

33. As a result of the Defendant's extreme recklessness in failing to provide adequate protections against the unauthorized dissipation of cash placed under his control as a corporate officer for use in the RJR Call Center bonus program, and in failing to account for such funds to the corporation, resulting in actual damages to RJR in the amount of $38,951.50, such failure constituted a defalcation by the Defendant while acting in a fiduciary capacity as to RJR.[23]

34. For the reasons set forth herein, the debt owed by the Defendant, Loren Keith Farnsworth, to the Plaintiff, RJR Insurance Services, Inc., in the amount of $38,951.50, is therefore excepted from discharge as a debt arising from a

---

[22] Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).

[23] In applying the heightened standard expressed in *Bullock* and in concluding that, even under that heightened standard, the Defendant has committed a defalcation under the circumstances of this case, the Defendant's conduct clearly constituted a "willful neglect of duty" and met the lower objective recklessness standard expressed in *Harwood* and *Schwager* to establish a defalcation. Because a defalcation is established under either analysis, the Court believes that it is proper to utilize the *Bullock* defalcation analysis in this context, notwithstanding its earlier recognition that only the circuit can overrule its own precedents.

defalcation in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).[24]

35. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

36. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 06/05/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[24] Accordingly, the Court need not reach the issues and arguments presented with respect to the alleged nondischargeability of this debt as an embezzlement under §523(a)(4) or as a willful and malicious injury under §523(a)(6).